| | |
|---|---|
| **BROADWAY ELECTRIC SERVICE CORPORATION**<br>**1800 North Central Street**<br>**Knoxville, Tennessee 37917**<br><br>**and**<br><br>**ENGERT LLC**<br>**1715 Riverside Drive**<br>**Knoxville, Tennessee 37915**<br><br>   **PLAINTIFFS,**<br><br>**v.**<br><br>**THE WHITING-TURNER CONTRACTING COMPANY**<br>**300 East Joppa Road**<br>**Towson, Maryland 21286-3048**<br><br>**SERVE VIA CERTIFIED MAIL:**<br><br>  **CT Corporation System**<br>  **300 Montvue Road**<br>  **Knoxville, Tennessee 37919-5546**<br><br>   **DEFENDANT.** | **CIVIL ACTION NO. _____**<br><br>**Judge _____**<br><br><br><br>**COMPLAINT** |

   The Plaintiffs, Broadway Electric Service Corporation ("BESCO") and Engert LLC ("Engert") (collectively, "Plaintiffs"), through counsel, respectfully submit the following Complaint against the Defendant, The Whiting-Turner Contracting Company ("Whiting-Turner").

## PARTIES

   1.  BESCO is a corporation organized under the laws of the State of Tennessee with its principal place of business at 1800 North Central Street, Knoxville, Tennessee 37917. At all

879117:3:LEXINGTON

Case 3:23-cv-00365-DCLC-JEM  Document 1  Filed 10/10/23  Page 1 of 19  PageID #: 1

times relevant hereto, BESCO was authorized to do business in Tennessee. Accordingly, BESCO is a citizen of the State of Tennessee.

2. Engert is a corporation organized under the laws of the State of Delaware with its principal place of business at 1715 Riverside Drive, Knoxville, Tennessee 37915. At all times relevant hereto, Engert was authorized to do business in Tennessee. Accordingly, Engert is a citizen of the State of Delaware.

3. Whiting-Turner is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business at 300 East Joppa Road, Towson, Maryland 21286. At all times relevant hereto, Whiting-Turner was authorized to do business in Tennessee. Accordingly, Whiting-Turner is a citizen of the State of Maryland.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) based on diversity of citizenship and an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

5. This Court has personal jurisdiction over Whiting-Turner because it transacts business in the State of Tennessee.

6. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(a), because the substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in this District. Venue is also proper in this Court pursuant to T.C.A. § 66-11-208(a).

## FACTUAL BACKGROUND

7. The construction project, which is the subject of this Complaint, involves the construction of a new laboratory building known as the Oak Ridge National Laboratory Translational Research Capability Project, located at 3606 Central Avenue, Oak Ridge, Tennessee 37830 ("Project").

8. UT-Battelle, LLC ("UT-Battelle"), under a contract with the U.S. Department of Energy, is the Owner of the Project.

9. On or about September 4, 2019, Whiting-Turner contacted both BESCO and Engert to discuss that Oak Ridge National Laboratory ("ORNL") was soliciting a bid for a design build project on its campus, intending to gauge BESCO's and Engert's interest in joining Whiting-Turner in its bid to the Owner of the Project.

10. Accordingly, Whiting-Turner requested that both BESCO and Engert submit pricing, for their respective scopes of work, for the Project.

11. On or about October 4, 2019, both BESCO and Engert submitted their pricing to Whiting-Turner for the Project based upon the design information available to BESCO and Engert at that time.

12. Whiting-Turner insisted that both BESCO's and Engert's prices were too high and requested that both BESCO and Engert remove contingencies and escalation costs from their respective prices, with Whiting-Turner agreeing to carry the risk for those items.

13. With respect to Engert, Whiting-Turner also requested that Engert remove controls from its scope of work, stating that Whiting-Turner would carry such costs separately in its budget. Ultimately, Whiting-Turner elected to reinsert controls into Engert's scope of work, but Whiting-Turner continued to carry the risk of escalation costs and contingencies in its budget.

14. On or about March 2, 2020, both BESCO and Engert were notified that UT-Battelle was awarding the Project to Whiting-Turner.

3
879117:3:LEXINGTON
Case 3:23-cv-00365-DCLC-JEM Document 1 Filed 10/10/23 Page 3 of 19 PageID #: 3

15. On or about March 6, 2020, Whiting-Turner again approached both BESCO and Engert to request further reductions off their respective prices, ostensibly at the request of UT-Battelle.

16. On or about April 10, 2020, Whiting-Turner executed a contract with UT-Battelle to serve as the general contractor for the Project ("Prime Contract"). A copy of the Prime Contract, without all of its exhibits and referenced Contract Documents, is attached hereto as Appendix 1.

17. The original amount of the Prime Contract was $64,000,000.

18. On January 13, 2021, BESCO signed a subcontract with Whiting-Turner to furnish and install the electrical, security and low voltage scope of work on the Project ("BESCO Subcontract"). A copy of the BESCO Subcontract, without all referenced Contract Documents, is attached hereto as Appendix 2.

19. The original amount of the BESCO Subcontract was $9,300,000; but, by the specific terms of the BESCO Subcontract, the contract value was based upon the Basis of Design documents dated November 11, 2019. Additionally, the $9,300,000 contract amount was premised on Whiting-Turner's carrying the cost escalations and contingencies for any and all changes in its proposed Project costs to UT-Battelle.

20. On January 13, 2021, Engert signed a contract with Whiting-Turner to furnish and install the mechanical, HVAC, plumbing and controls scope of work on the Project ("Engert Subcontract"). A copy of the Engert Subcontract, without all referenced Contract Documents, is attached hereto as Appendix 3.

21. The original amount of the Engert Subcontract was $16,220,500; but, by the specific terms of the Engert Subcontract, the contract value was based upon the Basis of Design

documents dated November 11, 2019. Additionally, the $16,220,500 contract amount was premised on Whiting-Turner's carrying the cost escalations and contingencies for any and all changes in its proposed Project costs to UT-Battelle.

22. Throughout the course of the Project, Engert incurred escalation costs of nearly $1,000,000; and BESCO incurred escalation costs in excess of $1,000,000.

23. Whiting-Turner submitted a Request for Equitable Adjustment ("REA") to UT-Battelle for various escalation costs for Whiting-Turner, BESCO, Engert and other Whiting-Turner subcontractors; but UT-Battelle rejected the REA. Nonetheless, both BESCO and Engert have incurred those escalation costs and have carried them for the benefit of Whiting-Turner and UT-Battelle.

24. By the terms of the Prime Contract, Whiting-Turner was required to coordinate all portions of the work on the Project, including the work of each of its subcontractors.

25. By the terms of the Prime Contract, Whiting-Turner was required to properly sequence the work of its subcontractors and to control the work of its subcontractors on the Project.

26. Under the terms of both the BESCO Subcontract and Engert Subcontract, Whiting-Turner was required to prepare, maintain and supplement a detailed, critical path method construction schedule, setting forth a timely and orderly progression of the work on the Project through Project completion.

27. Under Tennessee law (which governs the BESCO Subcontract and Engert Subcontract), Whiting-Turner had the obligation to provide both BESCO and Engert with unimpeded access to its work on the Project.

28. Additionally, under Tennessee law, Whiting-Turner could not interfere or hinder the progress of both BESCO's and Engert's work on the Project.

29. Whiting-Turner failed to properly manage and coordinate the work of its other subcontractors on the Project, which delayed both BESCO and Engert on the Project and which forced both BESCO and Engert to incur additional time and costs, as well as suffer other damages.

30. Whiting-Turner failed to use appropriate skill and judgment in supervising, managing and coordinating the work on the Project.

31. Whiting-Turner failed to coordinate the work of its other subcontractors on the Project so as not to interfere with or hinder both BESCO's and Engert's work on the Project.

32. Whiting-Turner failed to ensure timely completion of work performed by its subcontractors precedent to both BESCO's and Engert's work on the Project.

33. Whiting-Turner improperly, ineffectively and negligently managed the change process on the Project.

34. Whiting-Turner also mismanaged the process relating to BESCO's and Engert's Requests for Information ("RFI"). Whiting-Turner's inept handling of the RFI process left both BESCO and Engert in a lurch in the performance of certain aspects of their work on the Project.

35. With great regularity, Whiting-Turner directed both BESCO and Engert to perform extra work; and after BESCO and Engert completed such additional work, Whiting-Turner refused to pay both BESCO and Engert for the extra work.

36. Whiting-Turner failed to provide both BESCO and Engert with reasonable access and conditions in which to perform their work on the Project.

37. Whiting-Turner failed to properly sequence the work on the Project which negatively impacted both BESCO's and Engert's performance on the Project.

38. Whiting-Turner failed to generate, and regularly update and publish, to the subcontractors a Project schedule that conforms to normal construction industry practices for a project of the complexity of this Project.

39. In fact, early in the Project, Whiting-Turner issued multiple schedules by activity (e.g., crane schedule, concrete schedule, steel schedule, decking schedule and fireproofing schedule) that directly conflicted with one another and the "official" job schedule. Whiting-Turner's "official" schedule did not sufficiently clarify those conflicting tasks, and Whiting-Turner did not issue any schedule updates for months.

40. Whiting-Turner completely mismanaged the scheduling and coordination process on this Project.

41. As a result of its failed project management and negligent scheduling efforts, Whiting-Turner never provided a workable schedule on the Project.

42. On or about November 18, 2021, Whiting-Turner realized its shortcomings and retained a third-party scheduler to assist with the scheduling on the Project.

43. Whiting-Turner conducted schedule coordination meetings involving its various subcontractors and the third-party scheduler; however, such scheduling meetings ended late in December, 2021 without a completed Project schedule.

44. Even with the apparent assistance of a third-party scheduler, Whiting-Turner failed to incorporate the feedback of its subcontractors and failed to provide a workable Project schedule, as durations remained insufficient and sequencing logic remained flawed.

7

45. Due to Whiting-Turner's ineptitude, mismanagement and negligence, both BESCO's and Engert's work on the Project was negatively impacted and otherwise disrupted.

46. Whiting-Turner misunderstood ORNL's working environment as evidenced, in part, by Whiting-Turner's planned positioning of a crane on the exterior of the Project building, which was too close to a neighboring building. As a result of Whiting-Turner's misunderstanding of ORNL's requirements and its negligent planning, Whiting-Turner changed the crane path to run down the center of the Project building which caused various subcontractors, including, but not limited to, BESCO and Engert, to re-sequence their work.

47. Whiting-Turner failed to properly coordinate and sequence the work of various subcontractors (e.g., steel erector, fireproofing subcontractor, concrete subcontractor, painting subcontractor and excavator), which delayed, negatively impacted and disrupted BESCO's and Engert's work on the Project.

48. Whiting-Turner improperly allowed other subcontractors to store and stage their materials on the interior of the building for extended periods of time, which interfered with and impeded BESCO's and Engert's work on the Project.

49. Whiting-Turner disrupted BESCO's and Engert's productivity on the Project by not making a working elevator available for their use to bring equipment and material to the upper floors of the Project building.

50. Throughout the course of the Project, both BESCO and Engert submitted written notifications to Whiting-Turner that its mismanagement and negligence were delaying, negatively impacting, disrupting and adversely affecting their productivity on the Project; but Whiting-Turner either ignored BESCO's and Engert's written notifications, retaliated against

them with its responses and its subsequent actions, or otherwise bullied both BESCO and Engert on the Project.

51. Whiting-Turner also mismanaged both BESCO's and Engert's product data submittals, which negatively impacted BESCO's and Engert's progress of work on the Project.

52. In December, 2021, ORNL issued stringent COVID-19 testing protocols for the Project; and Whiting-Turner directed BESCO and Engert to comply with the rigorous COVID-19 testing protocols, which forced BESCO and Engert to incur additional costs to comply with the rigid testing protocols.

53. Throughout the duration of the Project, Whiting-Turner made or facilitated material and untimely changes to both BESCO's and Engert's work in the form of Architect's Supplemental Instructions ("ASIs"). BESCO and Engert would then price the changes reflected in the ASIs in the form of Potential Change Orders ("PCOs").

54. Oftentimes, Whiting-Turner would issue new ASIs in succession and before decisions were made on PCOs related to prior ASIs; and these subsequent ASIs, at times, conflicted with prior design changes or improperly assumed that changes found in prior ASIs had been made, when such decisions were still pending.

55. Whiting-Turner's mismanagement of the ASI process negatively impacted both BESCO's and Engert's work on the Project.

56. Whiting-Turner also improperly and negligently managed the process involving Activity Hazard Analyses ("AHAs"), which required UT-Battelle approval of safety protocols associated with specific items work tasks.

9

879117:3:LEXINGTON
Case 3:23-cv-00365-DCLC-JEM  Document 1  Filed 10/10/23  Page 9 of 19  PageID #: 9

57. Whiting-Turner's mishandling of the AHA procedures negatively impacted BESCO's and Engert's work on the Project and even forced an approximate one month shutdown of the Project in the Summer of 2023.

58. By the terms of the BESCO Subcontract, Whiting-Turner was required to pay BESCO within fifteen (15) days after Whiting-Turner received payment from UT-Battelle or within such shorter period of time specified by Tennessee law.

59. Throughout the course of the Project, Whiting-Turner failed to pay BESCO in a timely fashion in accordance with the terms of the BESCO Subcontract and in accordance with Tennessee law, in material breach of the BESCO Subcontract.

60. By the terms of the Engert Subcontract, Whiting-Turner was required to pay Engert within fifteen (15) days after Whiting-Turner received payment from UT-Battelle or within such shorter period of time specified by Tennessee law.

61. Throughout the course of the Project, Whiting-Turner failed to pay Engert in a timely fashion in accordance with the terms of the Engert Subcontract and in accordance with Tennessee law, in material breach of the Engert Subcontract.

62. In accordance with the terms of the BESCO Subcontract, Whiting-Turner was required to pay BESCO for additional work, which Whiting-Turner directed BESCO to perform.

63. BESCO performed additional work at Whiting-Turner's direction, but Whiting-Turner has failed or refused to pay BESCO for such additional work, in material breach of the BESCO Subcontract.

64. In accordance with the terms of the Engert Subcontract, Whiting-Turner was required to pay Engert for additional work, which Whiting-Turner directed Engert to perform.

65. Engert performed additional work at Whiting-Turner's direction, but Whiting-Turner has failed or refused to pay Engert for such additional work, in material breach of the Engert Subcontract.

66. The BESCO Subcontract required Whiting-Turner to pay BESCO for overtime directed by Whiting-Turner.

67. BESCO worked overtime hours at Whiting-Turner's direction, but Whiting-Turner has failed or refused to pay BESCO for such overtime work, in material breach of the BESCO Subcontract.

68. The Engert Subcontract required Whiting-Turner to pay Engert for overtime directed by Whiting-Turner.

69. Engert worked overtime hours at Whiting-Turner's direction, but Whiting-Turner has failed or refused to pay Engert for such overtime work, in material breach of the Engert Subcontract.

70. Pursuant to the terms of the BESCO Subcontract, Whiting-Turner is required to pay BESCO for additional work beyond the Basis of Design, as that term is defined in the BESCO Subcontract.

71. BESCO has performed additional work beyond the Basis of Design, but Whiting-Turner has failed or refused to pay BESCO for such additional work, in material breach of the BESCO Subcontract.

72. Pursuant to the terms of the Engert Subcontract, Whiting-Turner is required to pay Engert for additional work beyond the Basis of Design, as that term is defined in the Engert Subcontract.

73. Engert has performed additional work beyond the Basis of Design, but Whiting-Turner has failed or refused to pay Engert for such additional work, in material breach of the Engert Subcontract.

74. The BESCO Subcontract required that Whiting-Turner pay BESCO specific Change Order rates.

75. BESCO has performed certain Change Order work on the Project and has charged Whiting-Turner in accordance with the contractual Change Order rates, but Whiting-Turner has failed or refused to pay BESCO the agreed upon Change Order rates, in material breach of the BESCO Subcontract.

76. Pursuant to the terms of the Prime Contract, Whiting-Turner agreed to execute its work on the Project, utilizing certain personnel as negotiated with UT-Battelle.

77. Upon information and belief, Whiting-Turner used different personnel on the Project, in material breach of both the Prime Contract, the BESCO Subcontract and the Engert Subcontract.

78. As a direct and proximate result of Whiting-Turner's actions, inactions, mismanagement, negligence, ineptitude and material breaches of the BESCO Subcontract, BESCO has incurred additional costs and suffered damages, including, but not limited to, extended general conditions, extended home office overhead, additional costs for scope changes, material and equipment escalation costs, direct costs related to compliance with ORNL's stringent COVID-19 testing protocols which Whiting-Turner enforced, loss of labor productivity, overtime labor costs, labor escalation costs, unpaid contract balance and interest on all unpaid amounts.

79. Throughout the course of the Project, BESCO has put Whiting-Turner on written notice of such claims and damages; but Whiting-Turner has failed or refused to address such claims and has further failed and refused to pay BESCO for any of its additional costs or damages.

80. As a direct and proximate result of Whiting-Turner's actions, inactions, mismanagement, negligence, ineptitude and material breaches of the Engert Subcontract, Engert has incurred additional costs and suffered damages, including, but not limited to, extended general conditions, extended home office overhead, additional costs for scope changes, material and equipment escalation costs, direct costs related to compliance with ORNL's stringent COVID-19 testing protocols which Whiting-Turner enforced, loss of labor productivity, overtime labor costs, labor escalation costs, unpaid contract balance and interest on all unpaid amounts.

81. Throughout the course of the Project, Engert has put Whiting-Turner on written notice of such claims and damages; but Whiting-Turner has failed or refused to address such claims and has further failed and refused to pay Engert for any of its additional costs or damages.

82. Whiting-Turner has acted in bad faith in its wrongful withholding of monies from BESCO, in violation of Tennessee law.

83. Whiting-Turner has acted in bad faith in its wrongful withholding of monies from Engert, in violation of Tennessee law.

84. Whiting-Turner has actively interfered in BESCO's ability to perform its work under the BESCO Subcontract and to closeout its work under the BESCO Subcontract.

85. Whiting-Turner has actively interfered in Engert's ability to perform its work under the Engert Subcontract and to closeout its work under the Engert Subcontract.

86. Whiting-Turner has an obligation to deal fairly and in good faith with BESCO and Engert on the Project.

87. BESCO has fulfilled all of its conditions precedent and has otherwise complied with its contractual obligations on the Project.

88. Engert has fulfilled all of its conditions precedent and has otherwise complied with its contractual obligations on the Project.

**COUNT I**
**(Breach of BESCO Subcontract)**

89. Plaintiffs reinstate the allegations contained in the preceding paragraphs as if fully set forth herein.

90. Whiting-Turner materially breached the BESCO Subcontract in a number of ways, including, but not limited to, its failure to pay BESCO in a timely fashion, its failure to pay BESCO for additional work which Whiting-Turner directed BESCO to perform, its failure to pay overtime to BESCO which Whiting-Turner directed BESCO to perform, its failure to provide a workable critical path method schedule, its failure to pay BESCO for additional work beyond the Basis of Design, its failure to pay BESCO agreed upon Change Order rates, its failure to properly manage and control its other subcontractors on the Project, its failure to execute its work in accordance with the plan negotiated with UT-Battelle, its failure to compensate BESCO for its delays and disruptions on the Project, its failure to adhere to the Project schedule, its failure to provide BESCO with unimpeded access to its work on the Project, its active interference in BESCO's performance thereby negatively impacting BESCO's productivity, its hindrance of BESCO's performance on the job, its active interference in progress of BESCO's work on the Project, its failure to properly manage the schedule on the Project, its failure to properly coordinate the work of other subcontractors on the Project, its failure to ensure the timely

completion of work performed by subcontractors precedent to BESCO and its failure to deal fairly and in good faith with BESCO on the Project.

91. As a direct and proximate result of Whiting-Turner's breaches of the BESCO Subcontract, BESCO has been damaged in an amount which exceeds $75,000.00.

## COUNT II
### (Breach of Engert Subcontract)

92. Plaintiffs reinstate the allegations contained in the preceding paragraphs as if fully set forth herein.

93. Whiting-Turner materially breached the Engert Subcontract in a number of ways, including, but not limited to, its failure to pay Engert in a timely fashion, its failure to pay Engert for additional work which Whiting-Turner directed Engert to perform, its failure to pay overtime to Engert which Whiting-Turner directed Engert to perform, its failure to provide a workable critical path method schedule, its failure to pay Engert for additional work beyond the Basis of Design, its failure to properly manage and control its other subcontractors on the Project, its failure to execute its work in accordance with the plan negotiated with UT-Battelle, its failure to compensate Engert for its delays and disruptions on the Project, its failure to adhere to the Project schedule, its failure to provide Engert with unimpeded access to its work on the Project, its active interference in Engert's performance thereby negatively impacting Engert's productivity, its hindrance of Engert's performance on the job, its active interference in progress of Engert's work on the Project, its failure to properly manage the schedule on the Project, its failure to properly coordinate the work of other subcontractors on the Project, its failure to ensure the timely completion of work performed by subcontractors precedent to Engert and its failure to deal fairly and in good faith with Engert on the Project.

15

94. As a direct and proximate result of Whiting-Turner's breaches of the Engert Subcontract, Engert has been damaged in an amount which exceeds $75,000.00.

## COUNT III
### (Negligence)

95. Plaintiffs reinstate the allegations contained in the preceding paragraphs as if fully set forth herein.

96. Whiting-Turner owed at least the following duties to both BESCO and Engert: (1) to exercise reasonable care in the performance of its work on the Project; (2) to use its best skill and judgment in supervising, managing and coordinating the work on the Project; (3) to properly manage the schedule on the Project; (4) to properly coordinate the work of other subcontractors on the Project so as not to interfere with BESCO's and Engert's work; (5) to ensure timely completion of the work performed by subcontractors precedent to both BESCO and Engert; (6) to ensure quality of work performed by subcontractors precedent to both BESCO and Engert; (7) to provide both BESCO and Engert with unimpeded access to their work on the Project; and (8) to coordinate the work of other subcontractors so as not to interfere with or hinder the progress of both BESCO's and Engert's work on the Project.

97. Whiting-Turner breached its duties owed to both BESCO and Engert, managed the schedule in a negligent manner, managed the Project overall in a negligent manner and coordinated the work of other subcontractors on the Project in a negligent manner.

98. Whiting-Turner's negligence caused damages to both BESCO and Engert.

99. As a direct and proximate result of Whiting-Turner's negligence, both BESCO and Engert have been damaged in an amount which exceeds $75,000.00.

## COUNT IV
### (Negligent Misrepresentation)

100. Plaintiffs reinstate the allegations contained in the preceding paragraphs as if fully set forth herein.

101. Throughout the course of the Project, Whiting-Turner had a pecuniary interest in convincing BESCO to execute the BESCO Subcontract so that BESCO could serve as the electrical subcontractor at its quoted price.

102. Throughout the course of the Project, Whiting-Turner had a pecuniary interest in convincing Engert to execute the Engert Subcontract so that Engert could serve as the mechanical, HVAC, plumbing and controls subcontractor at its quoted price.

103. Throughout the course of the Project, Whiting-Turner supplied false information to BESCO both prior to and after the execution of the BESCO Subcontract.

104. BESCO justifiably relied upon the information which Whiting-Turner provided to it.

105. Whiting-Turner failed to exercise reasonable care or confidence in communicating to BESCO information relating to the Project schedule, the Project status and BESCO's scope of work set forth within the BESCO Subcontract.

106. Throughout the course of the Project, Whiting-Turner supplied false information to Engert both prior to and after the execution of the Engert Subcontract.

107. Engert justifiably relied upon the information which Whiting-Turner provided to it.

108. Whiting-Turner failed to exercise reasonable care or confidence in communicating to Engert information relating to the Project schedule, the Project status and Engert's scope of work set forth within the Engert Subcontract.

17

109. As a direct and proximate result of Whiting-Turner's negligent misrepresentations, BESCO has been damaged in an amount which exceeds $75,000.00.

110. As a direct and proximate result of Whiting-Turner's negligent misrepresentations, Engert has been damaged in an amount which exceeds $75,000.00.

WHEREFORE, having stated their causes of action against Whiting-Turner, BESCO and Engert demand as follows:

1. Judgment against Whiting-Turner, in an amount which exceeds $75,000.00, in accordance with Counts I, II, III and IV of the Complaint;

2. Prejudgment and post-judgment interest on their respective contract balances and claims;

3. Reimbursement for their attorney's fees incurred in this action;

4. Reimbursement for any and all of their costs and expenses incurred in this action;

5. Trial by jury; and

6. Any and all other proper relief to which BESCO and Engert may be entitled.

Respectfully submitted,

*/s/ J. Ross Hutchison*
J. Ross Hutchison (BPR No. 31170)
STITES & HARBISON PLLC
401 Commerce Street
Suite 800
Nashville, Tennessee 37219
Phone: (615) 782-2200
Email: rhutchison@stites.com

*Counsel for Plaintiffs, Broadway Electric Service Corporation and Engert LLC*

OF COUNSEL:

William G. Geisen
(KY Bar #24805; OH Bar #0083049)
STITES & HARBISON PLLC
100 E. RiverCenter Blvd.
Suite 450
Covington, Kentucky 41011
Phone: (859) 652-7601
Email: wgeisen@stites.com

*Co-counsel for Plaintiffs, Broadway Electric Service Corporation and Engert LLC*